## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LEON SEGEN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | Civ. No. 08-456-LPS |
| | : | |
| OPTIONSXPRESS HOLDINGS INC. | : | |
| | : | |
| Defendant. | : | |

## OPINION

### June 29, 2009

Theodore J. Tacconelli, FERRY, JOSEPH & PEARCE, P.A., Wilmington, DE; Paul D. Wexler, BRAGAR WEXLER EAGEL & SQUIRE, P.C., New York, NY; and Glenn F. Ostrager, OSTRAGER CHONG FLAHERTY & BROITMAN, P.C. New York, NY, Attorneys for Plaintiff.

Lewis H. Lazarus and Katherine J. Neikerk, MORRIS JAMES, LLP, Attorneys for Defendant.

**Stark, Magistrate Judge:**

This is an action for attorneys' fees. Plaintiff's counsel, having effected the disgorgement

to the Defendant corporation of $1,106,618 in short-swing profits allegedly made by officers of

Defendant in violation of Section 16(b) of the Securities Exchange Act, 15 U.S.C. § 78p(b)

("§16(b)"), seek 25% of the recovered funds ($276,654), to which they claim they are entitled as

a "remedial incident" of the statute. Defendant responds that given its own efforts to quickly

obtain disgorgement from the violating officers following receipt of Plaintiff's demands – which

obviated the need for Plaintiff's counsel to expend any further effort in the matter – a reasonable

award of attorneys' fees should be limited to 4% of the recovered funds, an amount much nearer

to what Plaintiff's counsel claims is its lodestar of $42,975 for the case. For the reasons set forth

below, the Court finds that Plaintiff's counsel is entitled to a fee award of 8% of the total

recovered funds, which amounts to $88,529.44.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Leon Segen ("Segen") is a New York resident and the owner of common stock

in Defendant OptionsXpress Holdings, Inc. ("Options"), a Delaware corporation with its

principal place of business in Chicago, Illinois. (D.I. 1 ¶¶ 1-2) At all relevant times, Segen has

been represented by attorneys Paul D. Wexler ("Wexler") and Glenn F. Ostrager ("Ostrager" and,

collectively with Wexler, "Plaintiff's counsel"). Plaintiff's counsel are "lawyer-specialists" in

§16(b) litigation. *Klein ex rel. SICOR, Inc. v. Salvi*, 2004 WL 596109, at *9 ("*Salvi I*").

Section 16(b) provides that:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him of any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction.

Suit to recover short-swing profits may be brought by either the issuer itself or by any of its shareholders, "if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter." *Id.* The statute of limitations for filing suit pursuant to an alleged §16(b) violation is two years from the date the profits were realized. *Id.*

The instant dispute arises from Segen's demands, through counsel, that Options investigate and take action regarding two separate series of short-call transactions made by high-ranking officers of Options in violation of §16(b).

### *The Gray /G-Bar Demand*

On or about April 23, 2008, Segen, through counsel, served a written demand on Options, requesting that the company investigate whether G-Bar Limited Partnership ("G-Bar") and James Gray ("Gray") realized short-swing profits in violation of §16(b). (D.I. 30, Ex. A) Gray is Chairman of Options' Board of Directors and President of G-Bar. (D.I. 1 ¶ 4) Plaintiff's demand reviewed several Form 4 Statements filed by G-Bar with the Securities and Exchange Commission (SEC), from which Plaintiff's counsel concluded that Gray and/or G-Bar obtained $709,982 in disgorgeable short swing profits. (D.I. 30, Ex. A) As disclosed by G-Bar to the SEC, the transactions in question involved several short-call options that expired on June 17, 2006 and March 22, 2008. (D.I. 33, Exs. 3-6) The statute of limitations for filing suit against

2

Gray/G-Bar relating to the majority of the transactions under §16(b) was due to expire on June 17, 2008 – less than two months from Segen's demand letter, and before the expiration of the 60-day period Options had to respond to Segen's April 23 demand.

On May 8, 2008, Gabor Balassa ("Balassa"), an attorney for Options, wrote to Wexler acknowledging receipt of Plaintiff's demand. Balassa's letter noted that Options was "reviewing the issues raised in [Plaintiff's] letter and will respond to [Plaintiff's counsel] in due course." (D.I. 33, Ex. 11)

On May 19, 2008, Balassa telephoned Wexler and told him that G-Bar and/or Gray would disgorge the full amount of short-swing profits sought by Plaintiff, less $5,200 in transaction costs. (D.I. 32, Balassa Decl. ¶ 4; D.I. 40, Wexler Decl. ¶ 6) Balassa and Wexler disagreed as to whether it was then the appropriate time for Plaintiff's counsel to provide their time records to Options to calculate their fee award; Wexler also informed Balassa that Segen "did not consider the matter concluded without some proof that all the profits had been accounted for and disgorged." (D.I. 40, Wexler Decl. ¶ 6) On May 22, 2008, Wexler confirmed to Balassa that Plaintiff's counsel would not provide their time records, because "we resist the notion that [counsel's lodestar is] any basis as a metric" for calculating their fee. (D.I. 32, Balassa Decl. ¶ 6, Ex. A; D.I. 40, Wexler Decl. ¶ 6)

Also on May 22, 2008, Wexler sent Balassa a letter declaring Plaintiff's counsel's position that they were entitled to 25% of the recovered profits, in light of the approaching expiration date on the statute of limitations and the fact that, "but for the demand made by Segen, there would have been no recovery. . . . Had the existence of these claims been obvious, it is almost inconceivable that transactions by the Chairman of the Board and a partnership that he

3

controls could have escaped [Options'] notice." (D.I. 33, Ex. 12 at 2)  Wexler also reiterated Plaintiff's counsel's request that Options furnish verification of disgorgement from G-Bar/Gray. *Id.* at 3.

Balassa replied by letter on May 29, 2008, again requesting Plaintiff's counsel's hourly fees and costs. (D.I. 33, Ex. 13)  He further articulated Options' position that Plaintiff's counsel's lodestar for the case was relevant to either a lodestar or percentage-of-recovery award calculation. *Id.* The letter did not provide verification of a settlement with G-Bar/Gray. *Id.*

On June 2, 2008, Wexler wrote to Balassa seeking information "that would support the conclusion that all disgorgeable profits realized by G-Bar and Mr. James Gray will be fully disgorged," including evidence of Gray's "pecuniary interest in all relevant transactions by G-Bar and in the proposed settlement." (D.I. 33, Ex. 18)

### *The Bennett Demand*

Meanwhile, on or about May 31, 2008, Ostrager served a second demand letter on Options, requesting that Options' board of directors investigate whether Ned W. Bennett ("Bennett"), the Executive Vice Chairman of Options and a company director, had realized short-swing profits in trading Options securities. (D.I. 1 ¶ 6)  The identified transactions involved several short-call options, all of which expired on either January 20, 2007 or March 17, 2007. (D.I. 33, Ex. 14)  The demand estimated that $413,100 in disgorgeable profits had been realized by Bennett. *Id.*

### *Options' Settlement Offer Rejected by Plaintiff's Counsel*

On June 3, 2008, Wexler and Balassa "had a conversation" during which Balassa offered Plaintiff's counsel $30,000 in attorneys' fees to settle the Gray/G-Bar and Bennett matters, along

4

with claims "against . . . any other [Options] insiders."[1]  (D.I. 40 Wexler Decl. ¶ 10)  Wexler

rejected the offer.  (D.I. 33, Ex. 19)

***Options Reviews the Bennett Demand***

On June 5, 2008, Balassa formally replied to Ostrager's demand regarding the Bennett

transactions, informing him by letter that Options was "reviewing the issues raised in [Plaintiff's

counsel's] letter" and would respond in due course.  (D.I. 33, Ex. 16)

***Disgorgement by G-Bar/Gray***

On June 6, 2008, Balassa provided Plaintiff's counsel with a copy of Options' settlement

agreement with G-Bar (also dated June 6, 2008), showing disgorgement of $704,741.78 in

disgorged net profits from G-Bar.  (D.I. 1 ¶ 5; D.I. 33, Ex. 19)

On June 11, 2008, Wexler acknowledged the settlement but reiterated his request for

further verification of full disgorgement, including evidence regarding Gray's pecuniary interest

in the G-Bar transactions.  (D.I. 33, Ex. 19)  Wexler's letter also continued to press Plaintiff's

--------

[1]Wexler's affidavit states that he found Options' settlement offer "odd and inappropriate, especially since at that time, [Options] had not even had the opportunity to perform the investigation requested by Mr. Ostrager in his May 31 letter."  (D.I. 40, Wexler Decl. ¶ 10)  Wexler's statement is one of several made by Plaintiff's counsel suggesting that Options conducted less than a full investigation into potentially improper transactions by its insiders and/or may not have obtained full disgorgement from G-Bar/Gray, Bennett, or other unnamed violators.  *See* D.I. 39 at 6 ("[E]ven now, it is not clear that Gray and Bennett have disgorged all their insider profits."); D.I. 40, Wexler Decl. ¶¶ 13-14 (noting that Plaintiff's counsel "never received any of the information requested concerning other trades that these insiders may have made" and that, "[i]n light of the compressed time period between the demand letter and the claimed disgorgement in each case, it seems unlikely that Options made any investigation at all"); D.I. 46, Tr. at 46 ("Who the heck knows what else there is.  We've never had anybody turning anything over from the OptionsXpress. They were ordered to bury this.").  Plaintiff's counsel has not established the relevance, if any, of these suggestions to the fee dispute – particularly given Plaintiff counsel's repeated insistence that their efforts led to "a 100% recovery of the claims at issue" (D.I. 29 at 14), and both parties' agreement that the Court should determine the appropriate fee award based on the record before it (D.I. 25 at 1).

counsel's position that they were entitled to 25% of the settlement fund; it added that Plaintiff's counsel's lodestar through June 11 was approximately $31,000.  *Id.*

On June 19, 2008, Balassa provided Wexler with a photocopy of G-Bar's disgorgement check to Options, though he did not provide the documentation regarding Gray's involvement with G-Bar sought by Plaintiff's counsel.  (D.I. 33, Ex. 20) Balassa's accompanying letter noted that Plaintiff's counsel's lodestar should not have been calculated through June 11, when "the relevant period . . . ends much earlier."  *Id.*

### Disgorgement by Bennett

On July 15, 2008, Balassa provided Ostrager with a copy of Options' July 1 settlement agreement with Bennett, pursuant to which Bennett paid $401,876.24 (a figure equal to the $413,100 in short-swing profits realized by Bennett, minus $11,223.76 in transaction costs he incurred).  (D.I. 33, Ex. 17)

Ostrager replied to Balassa the same day, requesting documentation regarding Options' investigation into Bennett's transactions and explaining Plaintiff's counsel's view that an investigation was required "in light of . . . Bennett's failure to properly document his transactions . . . with Form 4 filings required by Section 16(a) of the Exchange Act."  (D.I. 33, Ex. 21)  The letter further noted counsel's position that they were entitled to 25% of the Bennett recovery as attorneys' fees.  *Id.*

### The Instant Action

On July 23, 2008, Plaintiff's counsel filed the instant action.  (D.I. 1)  In the course of document production, on December 1, 2008, Plaintiff's counsel provided Options with their time records, showing a total of 64.3 hours spent on work related to the G-Bar/Gray and Bennett

demands.  (D.I. 33, Exs. 7-8, 22)  On March 3, 2009, the Court modified the Scheduling Order to reflect the parties' agreement that further discovery was unnecessary and that the matter could be resolved on a paper record.  (D.I. 25 at 1)  Thereafter, the parties fully briefed their respective positions on an appropriate fee award.  (D.I. 29, 31, 39, 41)  The Court heard argument on this issue on June 5, 2009.  (D.I. 46)

## LEGAL STANDARDS

"[A] stockholder who is successful in maintaining [a §16(b)] action is entitled to reimbursement for reasonable attorney's fees on the theory that the corporation which has received the benefit of the attorney's services should pay the reasonable value thereof." *Smolowe v. Delendo Corp.*, 136 F.2d 231, 241 (2d Cir. 1943). This "same insistent policy applies even if suit is not brought . . . [including in situations where] investigation by a stockholder's attorney led to a letter to a corporation; no litigation was necessary, and the corporation recovered substantial short-swing profits from [the insider]." *Blau v. Rayette-Faberge, Inc.*, 389 F.2d 469, 472 (2d Cir. 1968).

Courts typically apply one of two methods for determining attorneys' fees in §16(b) cases: the percentage of recovery method or the lodestar method. *See Klein v. Salvi*, 115 Fed. Appx. 515, 2004 WL 2931121 at *1 (2d Cir. 2004) ("*Salvi II*") (noting that "district court was not obligated to use the percentage method" and affirming award of attorneys' fees based on lodestar); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 123 (2d Cir. 2005) (observing that "[t]he trend in this Circuit is toward the percentage method").

As both parties acknowledge, the Third Circuit has not addressed how attorneys' fees

7

should be calculated in a §16(b) matter. (D.I. 29 at 12; D.I. 31 at 13) However, in other cases in which lawyers' efforts resulted in the creation of a common fund, the Third Circuit has adopted the percentage of recovery method. *See In re AT&T Corp.,* 455 F.3d 160, 164 (3d Cir. 2006) ("In common fund cases . . . the percentage-of-recovery method is generally favored because it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure.") (internal quotation marks omitted); *see also In re Rite Aid Corporation Securities Litig.*, 396 F.3d 294, 300 (3d Cir. 2005).

The Third Circuit has delineated seven factors for district courts to consider in awarding attorneys' fees in common fund cases in which the fees are based on a percentage of the total recovery:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs counsel; and (7) the awards in similar cases.

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000). These factors "need not be applied in a formulaic way . . . in certain cases, one factor may outweigh the rest." *Id.*[2] Furthermore, the *Gunter* factors are "not intended to be exhaustive." *In re AT&T*, 455 F.3d at

---

[2]It appears that no court within the Third Circuit court has had occasion to apply the *Gunter* factors to a claim for attorneys' fees under §16(b). Hence, Options contends this Court should employ the factors the Second Circuit applies in §16(b) cases: (1) the time and effort expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risks of the litigation; (4) the quality of the representation; (5) the amount of the fee in relation to the settlement; and (6) public policy considerations. *See Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000). Because, as Options has noted, the Second Circuit's factors are "essentially the same" as the Third Circuit's *Gunter* factors (D.I. 31 at 13), there is no need to address the Second Circuit standard directly. The Court will address the public policy factor, which both parties have briefed and which both parties urge the Court to consider.

165; *see also In re Prudential Ins. Co. of America Sales Practice Litig.*, 148 F.3d 283, 340 (3d

Cir. 2006) (noting three additional factors that may be relevant to common-fund fee analysis:

value of benefits conferred by counsel as distinguished from benefits conferred by other parties;

percentage counsel would have negotiated as fee had representation been undertaken on

contingency basis; and any innovative terms of settlement).  Absent unusual circumstances, a

smaller common fund increases the percentage of recovery.  *See In re Cendant Corp. PRIDES*

*Litig.*, 243 F.3d 722, (3d Cir. 2001); *see In re Prudential*, 148 F.3d at 339.

     Even where calculating attorneys' fees as a percentage of the recovery, the Third Circuit

recommends that district courts employ an abbreviated version of the lodestar method "to cross-

check the reasonableness" of the court's proposed fee.  *In re AT&T,* 455 F.3d at 164.  This cross-

check is performed "by dividing the proposed fee award by the lodestar calculation, resulting in a

lodestar multiplier."  *Id.*  The lodestar itself is calculated "by multiplying the number of hours

reasonably worked on a client's case by a reasonable hourly billing rate for such services based

on the given geographical area, the nature of the services provided, and the experience of the

attorneys.  The [resulting] multiplier is a device that attempts to account for the contingent nature

or risk involved in a particular case and the quality of the attorneys' work."  *In re Rite Aid*, 396

F.3d at 305-06.  If, in performing the lodestar cross-check, the court finds that the multiplier is

too large, "the court should reconsider its calculation . . . with an eye toward reducing the

award."  *Id.* at 306.  Furthermore, the court must "explain how the application of a multiplier is

justified by the facts of a particular case."  *In re Prudential,* 148 F.3d at 341.  Nevertheless, the

"cross-check, while useful, should not displace a district court's primary reliance on the

percentage-of-recovery method."  *In re AT&T,* 455 F.3d at 164.

9

Thus, the Court will first determine an appropriate fee using the percentage of recovery, relying primarily on the *Gunter* factors. The Court will then conduct a lodestar cross-check.

## DISCUSSION

In weighing the work of Plaintiff's counsel under the *Gunter* factors, as set forth below, the Court finds that 8% of the total amount disgorged to Options is a reasonable and appropriate award of attorneys' fees. This amount is equal to a lodestar multiplier of 2.06, which satisfies the lodestar cross-check.

## I. Applying the *Gunter* Factors

### A. *Size of the Fund Created and Number of Persons Benefitted*

Options does not deny that Plaintiff's counsel's investigative efforts and two demands laid the groundwork that led to the recovery by Options of $1,106,618.02.[3] *See* D.I. 4 ¶¶ 5, 7-8 (Defendant's Answer admitting "that the April 23, 2008 letter led to a review of the specified transactions and the payment of $704,741.78 to the Company;" "that the May 31, 2008 letter led to a review of the specified transactions and the payment of $401,876.24 to the Company;" and "that the plaintiffs' demand led to payments to the Company"). The Court agrees with Plaintiff's counsel that "but for Segen, there would have been no recovery." (D.I. 29 at 15)  With respect to six of the eleven G-Bar transactions cited in Plaintiff's initial demand, the statute of limitations was due to expire less than two months from the time the demand was served. (D.I. 30, Ex. A; D.I. 33, Ex. 3)  There is no evidence (or even any suggestion) that Options would have taken any

---

[3]Plaintiff's counsel gives the figure as $1,108,614 in their opening brief. (D.I. 29 at 14) The correct figure, as shown by Options' settlement agreements with G-Bar and Bennett, is $1,106,618.02. (D.I. 33, Exs. 17, 19)

action with respect to any of the transactions at issue had it not been for the demands of Plaintiff's counsel.

Thus, Plaintiff's counsel are responsible for achieving a substantial financial recovery for Options – and, by extension, all of Options' shareholders. This factor weighs heavily in favor of awarding Plaintiff's counsel a significant percentage of the disgorged profits.

### B. *Substantial Objections to Fees Requested*

Segen maintains that this factor is not applicable to the Court's analysis, because no shareholders (the equivalent of class members) have objected to Plaintiff's counsel's proposed fee. (D.I. 29 at 16) Options responds that its own objections are "significant" to the fee determination (D.I. 41 at 7), but its argument is unpersuasive. As applied in other (non-§16(b)) cases, this factor relates to objections "by members of the class." *Gunter*, 223 F.3d at 195 n.1; *see also In re Rite Aid*, 396 F.3d at 301 n.9. It is Options' shareholders who are most analogous to class members in a class action lawsuit.

On the other hand, given that there has been no formal notice to the shareholders of Plaintiff's counsel's request for 25% of the recovery, the absence of shareholder objections is also not highly probative. Overall, then, this factor is neutral, weighing neither in favor nor against Plaintiff's proposed fee award.

### C. *Skill and Efficiency of the Attorneys Involved*

No one disputes that Plaintiff's counsel are experienced §16(b) lawyers with a history of achieving significant disgorgements. *See Salvi I*, 2004 WL 596109, at *3 (Plaintiff's counsel obtained settlement of $10,750,000 for issuer); *FTR Consulting Group, Inc. v. Advantage Fund II Ltd.*, 2005 WL 2234039, at *1 (S.D.N.Y. Sept. 14, 2005) (Plaintiff's counsel obtained

11

settlements of $850,000 and $250,000).  So far as the instant dispute is concerned, Plaintiff's

counsel argues that "[i]dentifying the short-swing trades at issue required the monitoring of

trading activities of Options insiders over an extended period of time," and analyzing the

transactions "require[d] a high level of sophistication and knowledge of complex SEC

regulations."  (D.I. 29 at 17)

    According to Options, Plaintiff's counsel's very skill in §16(b) litigation significantly

undermines their claim to efficiency in working on the Options demands.  *See* D.I. 46, Tr. at 36

(counsel for Options arguing that, because Plaintiff's counsel are "very experienced Section

16(b) litigators . . . the time spent on this case was excessive" and "there was a lack of delegation

to people with lower hourly rates").  Specifically, Options cites as excessive the 6.3 hours

Plaintiff's counsel spent on research and analysis related to the G-Bar/Gray demand, and argues

that counsel was remiss in delegating merely .2 of the 64.3 billable hours to lawyers with lower

hourly rates.  (D.I. 31 at 19-20)  Options takes further issue with the fact that both Wexler and

Ostrager "billed time for reviewing SEC filings, conducting legal research, reviewing the other's

legal research, and drafting the April 23 demand."  (D.I. 31 at 19)  Options points out that

Wexler and Ostrager have been criticized for duplication of effort by district courts twice before.

*See FTR*, 2005 WL 2234039, at *6 (observing that substantial amount of Plaintiff's counsel's

research and briefing could have been done by associates or paralegals and reducing requested

36% fee award to 25%); *Salvi I*, 2004 WL 596109, at *9-11 (finding considerable overlap in

Wexler's and Ostrager's work and characterizing the quality of their representation as "ordinary,"

though ultimately awarding counsel 8% of recovery).  Options argues that here the Court should

take a hard line in finding any duplication of effort not recoverable.

12

The Court finds that Plaintiff's counsel's work was performed in an efficient manner. The 6.3 hours counsel spent on legal research related to the Gray/G-Bar demand (that ultimately resulted in disgorgement of nearly $705,000 in short-swing profits) may or may not have been precisely the amount of time required for counsel to carry out their duties responsibly, but it is certainly within the realm of efficient conduct. Nor is the Court troubled by the fact that Wexler and Ostrager both billed time for "conducting legal research, reviewing the other's legal research, and drafting the April 23 demand." (D.I. 31 at 19) Moreover, it is debatable whether, if counsel had assigned the duty of reviewing the SEC filings to less experienced attorneys with lower hourly rates, the result would have been any more efficient, since it may well have taken such lawyers longer to complete the work.

The efficiency of Plaintiff's counsel must be assessed in an overall context in which their efforts were the "but for" cause of a recovery well exceeding one million dollars (and constituting a 100% recovery on Plaintiff's demands), on which counsel worked less than 65 hours altogether. On an hourly basis, the recovery to Options was $17,210.23 for every hour Plaintiff's counsel devoted to this case. Thus, the skill and efficiency factor weighs heavily in favor of awarding a significant percentage of recovery fee.

### D. *Complexity and Duration of the Litigation*

Although Plaintiff's counsel argues that this factor "mitigate[s] in favor" of their requested fee, they support their claim of complexity only by noting that identification of the transactions "required the monitoring of trading activities of Options insiders over an extended period of time," which was "time-consuming and costly," and required a "knowledge of complex

SEC regulations."[4]  (D.I. 29 at 17-18)  Options replies that Segen's demands "involved a technical, but straightforward, application of Rule 16b-6(d)," a task that would not be particularly complex to skilled §16(b) specialists like Ostrager and Wexler.  The Court agrees with Options that the matter was, to attorneys with counsel's expertise (for which they have been given credit in connection with the previous factor), not particularly complex.

With regard to the duration of the matter, because the profits were disgorged before Plaintiff's counsel had to file suit, this factor weighs against awarding counsel the kind of robust fee award one might see in a case of longer duration.  Even accepting that all Plaintiff's counsel's work on the matter was reasonable and justifiable, including the drafting of a never-filed complaint, the fact remains that the duration of the representation was not long (and the duration of "litigation" was zero).  Overall, then, this factor weighs substantially against awarding Plaintiff's counsel's requested 25% fee.

### E.  *Risk of Non-Payment*

Plaintiff's counsel argues that the risk of non-payment is "substantial," based on its experience in other §16(b) litigation, but not due to any feature of the instant case.  (D.I. 29 at 18-19)[5]  Options responds that the relatively modest amount ($1,106,618) demanded here, in comparison to many other §16(b) suits, reduced the risk of non-payment.  (D.I. 41 at 11)  Options

_____

[4]Perhaps recognizing that there is minimal basis for the argument that the claims themselves were complex to those trained in identifying them, Plaintiff's counsel conflate their arguments as to factors three ("skill and efficiency of attorneys") and four ("complexity and duration of litigation") into a single section in their brief.  *See* D.I. 29 at 16-18.

[5]Plaintiff's counsel refer to their work in *Roth v. Jennings,* 489 F.3d 499 (2d Cir. 2007), in which, "[a]fter six and [a] half years of litigation, the defendant has now defaulted and [Plaintiff's counsel] is awaiting the entry by the district court of judgment in the amount of $4,249,408, which is unlikely to be []enforceable."  (D.I. 29 at 19)

further argues that it "eliminated the risk of non-payment by the insiders by promptly securing full disgorgements from them." *Id.*

The Court finds that a moderate risk of non-payment was present throughout most of Plaintiff's counsel's work on the instant matter, though early settlement between Options and the violators ensured that the risk was not amplified by the need to assume the costs of litigation. Options asks the Court to exercise a generous measure of hindsight by finding that it eliminated any and all risk of non-repayment when it "promptly recovered 100% of the short-swing profits." (D.I. 31 at 19) Plaintiff's counsel could not have known this would be the outcome when they commenced review of the relevant SEC filings, nor when they served their demands on Options. Nor did Options provide immediate proof of disgorgement, nor even immediate verbal assurances that such disgorgement would occur.[6] While such proof and assurances did come without undue delay, that did not retroactively eliminate the risk inherent in Plaintiff's counsel's decision to invest time in monitoring, investigating, and then bringing to Options' attention the trades conducted by Options' insiders. *See Salvi I*, 2004 WL, at *10 ("Section 16(b) can be enforced, and the market's integrity can be protected, only if attorneys are willing to . . . assume the risk that is involved in investigating numerous SEC filings in the search to uncover insiders who make improper short-swing profits, and filing lawsuits against those unwilling to return such profits.").

---

[6]Options provided verbal assurance that it would receive disgorgement from G-Bar/Gray on May 19, 2008, approximately one month after Plaintiff's April 23 demand. (D.I. 32, Balassa Decl. ¶ 4; D.I. 40, Wexler Decl. ¶ 6) Plaintiff's counsel then requested proof of settlement, which Options did not provide until June 6, 2008. (D.I. 1 ¶ 5; D.I. 33, Ex. 19) With regard to the May 31 Bennett demand, Options provided Plaintiff's counsel with a copy of its July 1 settlement agreement with Bennett on July 15, 2008. (D.I. 33, Ex. 17)

Thus, while the Court does not give this factor significant weight – because Plaintiff's counsel were not required to assume the greater risk of incurring the costs of litigation – it concludes that a moderate element of risk was inherent in Plaintiff's counsel's representation.

**F.** *Amount of Time Spent on the Case*

As already noted, Options has argued vigorously that Plaintiff's counsel's records showing 64.3 hours devoted to this case are padded with unnecessary and duplicative labor, some of which could have been delegated to less expensive professionals. As previously stated, the Court does not agree. To the contrary, the Court credits Plaintiff's counsel with achieving a 100% disgorgement in connection with two separate demands based on a total of just 64.3 hours of work.

But while Segen's demands were the "but for" cause of the $1,106,618 recovery to Options, after Plaintiff's counsel completed their investigative efforts and legal research they were simply not called upon to do very much. Thus, taking together the relevant facts that Plaintiff's counsel was not required to devote time to extensive discovery or motions practice but nevertheless obtained a highly successful result in the time they expended on the matter, the Court finds that this – highly important – factor weighs substantially against the reasonableness of Plaintiff's counsel's proposed 25% fee award, but not so much as to justify reducing the fee to their lodestar.

**G.** *Awards in Similar Cases*

The Court is not aware of any §16(b) opinion reporting on a case closely resembling this one, in which: experienced §16(b) specialists identified violations by an issuer's high-ranking insiders and then, with considerable efficiency but relatively little expenditure of time and no

16

litigation, accomplished a 100%, seven-figure recovery for the issuer – that the issuer would not have otherwise obtained – through a series of demands, to which the issuer responded by promptly obtaining full disgorgement, but where the issuer nevertheless objected to the plaintiff's proposed fee award.  Necessarily, then, the "awards in similar cases" factor does not weigh heavily in the Court's fee determination.

Plaintiff's counsel notes that in other common fund cases in this Circuit courts "have awarded [attorneys'] fees in the 20% - 33 1/3% range," specifically pointing to *In re AT&T,* 455 F.3d at 160, in which the Third Circuit affirmed a district court's fee award of 21.5% of the total recovery in a securities fraud class action.  (D.I. 29 at 19)  *AT&T,* in which the shareholders' class action suit proceeded through eight days of trial before ending in a $100 million settlement, is factually distinguishable in so many respects as to be of no practical use in determining the appropriate fee here.

Options emphasizes another case, *Salvi I* (also involving Wexler and Ostrager), as "the most helpful case in this matter."  (D.I. 46, Tr. at 38)  In *Salvi I,* the district court applied the near-identical Second Circuit *Goldberger* factors to its §16(b) fee analysis and concluded, as the Court does here, that "the settlement plaintiff's counsel produced was substantial, and clearly [the issuer] itself would not have sued its [insider] or his controlled companies . . . to recover the insider profits that they gained from short-swing trading."  2004 WL 596109, at *10.  As Options notes, certain factors at issue in *Salvi I* were dissimilar from those at issue here, and weighed more heavily in favor of the plaintiff's proposed fee: the §16(b) claims were "uncommon" in their "complexity," and plaintiff's counsel devoted 1164 hours to the case, including by litigating through summary judgment briefing before settling.  *Id.* at *3, *11.  On the other hand, the *Salvi I*

17

court gave significant weight to what it viewed as plaintiff's counsel's "duplicative, and, to a degree, inefficient" effort, and deemed the quality of their representation "ordinary," due to "avenues [that] were not pursued well." *Id.* at *9, *11. Here, by significant contrast, the Court gives great weight to Plaintiff's counsel's efficiency in obtaining 100% disgorgement. Ultimately, the most salient feature of *Salvi I* is, that, weighing all the factors, the *Salvi I* court arrived at a reasonable fee award of 8% of the recovery – the same percentage the Court, weighing all the similar and dissimilar factors, orders in the instant case.[7]

## H. *Additional Factor: Public Policy Considerations*

Because the *Gunter* factors were not intended to be exhaustive, a district court may consider other factors it deems pertinent to the determination of a reasonable fee. *See In re AT&T*, 455 F.3d at 165. Here, both parties agree that the Court should assess the reasonableness of Plaintiff's counsel's proposed fee against public policy considerations. Plaintiff's counsel argue that it was only through their efforts that Options obtained a "windfall" from its insiders, and "'when it is reasonably clear that the corporation was about to sleep on its rights, the windfall seems even greater.'" (D.I. 29 at 21, quoting *Rayette-Faberge*, 385 F.2d at 474) They insist that "the policy behind [§16(b) is] to encourage counsel to investigate and litigate these claims that would otherwise not be pursued, [which] can only be served by an award of legal fees sufficient to justify the investigatory efforts and the pursuit of the claim." (D.I. 29 at 20) In response, Options warns that "Section 16(b) practitioners will regard the Court's ruling in this lawsuit as setting a floor for other Section 16(b) matters, since virtually every other matter would

---

[7]The *Salvi I* multiplier, 1.45, is broadly in line with the lodestar multiplier here, which, as discussed later in this Opinion, is 2.06.

involve more work." (D.I. 31 at 22) Options also notes that many §16(b) demands end in settlement between the shareholder's counsel, the issuer, and the violators, pursuant to which the issuer pays shareholder's counsel's proposed fee but "receives substantially less than the amount originally demanded" from the violators. *Id.* at 21. Options argues that only a low fee award will incentivize issuers to act as Options has here: "by obtaining a prompt, 100% recovery for its shareholders, rather than cutting a deal that recovers less from the Section 16(b) violator and buys off Plaintiff's counsel for a fee that is disproportionate to counsel's effort." *Id.* at 22-23.

Neither side presents a persuasive policy argument. The Court does not find it plausible that by awarding Plaintiff's counsel 8% of the recovery – a fee of nearly $90,000 for about 65 hours of work – it is providing insufficient incentive to shareholders' attorneys to pursue §16(b) cases such as this one. Nor, however, does the Court agree that, by requiring an issuer to give up 8% of a "windfall" recovery that exceeded $1.1. million – and to give it to the attorneys without whom there would have been no recovery – it will discourage other issuers from acting as Options has done here. Furthermore, the Court does not accept that its ruling sets a "floor" for all future §16(b) cases, since the ruling here is dependent on the specific (and evidently unique) constellation of factors presented here. In the end, the public policy considerations cited by the parties do nothing to alter the Court's conclusion that awarding 8% of the recovery to Plaintiff's counsel is reasonable and appropriate.

## I. *The Reasonable Percentage of Recovery*

Weighing together the factors, the Court finds that Plaintiff's counsel (1) created a significant benefit to Options' shareholders, which would not have occurred without their efforts, and (2) there are no objections by shareholders to awarding Plaintiff's counsel a significant

19

percentage of the recovery, which is reasonable in light of (3) the considerable skill and efficiency Plaintiff's counsel exhibited in bringing about the result so quickly. However, (4) the claims at issue were not particularly complex and were settled before litigation ensued, so (5) counsel incurred only a moderate risk that they would not be paid for their investigative efforts, rather than the more significant risk of non-payment attendant to litigation. Plaintiff's counsel (6) did not spend enough time on the matter to warrant their proposed fee, but should not be penalized for effecting a successful result in a short time, features that (among others) (7) distinguish this case from the others of which the Court is aware. Finally, the Court concludes that (8) policy considerations favor rewarding Plaintiff's counsel for their success, but not out of proportion to the *Gunter* factors. The Court finds nothing in the policy considerations cited by the parties to alter the conclusion resulting from its application of the *Gunter* factors.

Accordingly, the Court finds that a reasonable award of attorneys' fees in this case is 8% of the total recovery, or $88,529.44, which leaves the remaining $1,018,088.56 disgorged by Options' insiders with the company itself.

## II. The Lodestar Cross-Check

Plaintiff counsel's time records reflect a total lodestar of $42,975. (D.I. 33, Ex. 7-8) Options argues that the correct lodestar is actually $20,125. (D.I. 31 at 27) Options arrives at this number by reducing Plaintiff's counsel's total hours from 64.3 to 32.55 (based on Plaintiff's counsel's supposed inefficiency in investigating the Gray/G-Bar transactions, and for time they spent on the matter after the demands were sent), and adjusting Wexler's and Ostrager's hourly rates of $700 and $650, respectively, because those rates have gone up by more than "a reasonable increase of 15% - 20%" since the *FTR* case was heard in 2005. (*Id.* at 25-26) The

20

Court has already rejected Options' argument that Plaintiff's counsel's hours should be reduced for inefficiency. Neither does the Court find that the lodestar should be reduced by the twenty-six hours Plaintiff's counsel spent on the Gray/G-Bar and Bennett transactions after the demands were sent.[8] Options seeks to rely on *Rayette-Faberge*, in which the Second Circuit held that an attorney's §16(b) fee could not include recovery for time spent drafting an unnecessary complaint, where there was ample time left on the statute of limitations and there was "no indication by the corporation that it did not intend to enforce the claim." 389 F.2d at 474-75. Here, given the rapidly approaching expiration of the statute of limitations on several of the Gray/G-Bar transactions, the adversarial nature of the parties' interactions (over fees, Plaintiff's counsel's time records, and counsel's request for proof of disgorgement), and the number of demands at issue, it is understandable that Plaintiff's counsel would continue moving toward possible litigation, especially as the twenty-six hours they spent on the case after serving the demands hardly constitutes an egregious investment of time. Finally, the Court finds no basis in the record for concluding that Plaintiff's counsel's hourly rates are unreasonable. Thus, the Court accepts Plaintiff's counsel's claimed lodestar of $42,975.

Dividing the Court's proposed fee of $88,529.44 by the lodestar results in a multiplier of 2.06. A lodestar multiplier accounts for "the contingent nature or risk in the particular case involved and the quality of the attorney's work." *In re Rite Aid*, 396 F.3d at 305-06. In the instant case, the Court finds that a multiplier of 2.06 is justified by Plaintiff's counsel's quality of

---

[8]According to Plaintiff's counsel's records, this included time billed for research regarding "obligations of plaintiff's counsel prior to settlement," telephone calls and letters to Balassa seeking information about Gray's pecuniary interest in G-Bar and proof of settlement with G-Bar, and research on jurisdictional issues regarding the Complaint, all of which were reasonable under the circumstances of this case. (D.I. 33, Ex 7)

21

work, which effected the complete disgorgement of more than one million dollars in short-swing profits from high-ranking §16(b) violators in only 64.3 hours' time – a result that would not have occurred had Options been left to its own devices.[9]

A multiplier of 2.06 is also in keeping with the Third Circuit principle that "[m]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *In re Prudential*, 148 F.3d at 341 (internal quotation marks omitted). The Court recognizes that multipliers in the 2.0 to 3.0 range have frequently been justified by large expenditures of attorneys' time, which is not present here. *See In re Cendant Corp.*, 243 F.3d at 742 n.21; *see also* D.I. 46, Tr. at 40-41 (Options describing cases with multipliers ranging from 1.28 to 3.15 involving 17,000 to 50,000 billable hours). Here, Plaintiff's counsel were not called upon to take on the risks and burdens of litigation (and their fee has been reduced to less than one-third of their requested percentage as a consequence), but they nonetheless conferred a significant benefit on Options' shareholders in a fairly short amount of time. To reduce their fee award to the lodestar or anything near it would be to penalize Plaintiff's counsel for their efficiency and to ignore the Third Circuit's directive that success should be rewarded in common fund cases. *See In re AT&T Corp.,* 455 F.3d at 164.

## CONCLUSION

For the reasons set forth above, the Court finds that Plaintiff's counsel are entitled to a fee of 8% of the recovery, which is equal to $88,529.44. An appropriate order follows.

---

[9]Had the Court adopted Options' positions as to the correct lodestar ($20,125) and the appropriate fee award (which "would not exceed $43,054") (D.I. 31 at 27), the cross-check would have yielded a multiplier of around 2.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| LEON SEGEN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | Civ. No. 08-456-LPS |
| | : | |
| OPTIONSXPRESS HOLDINGS INC. | : | |
| | : | |
| Defendant. | : | |

## ORDER

For the reasons set forth in the Opinion filed this same date, this Court, having considered

the parties' briefing on Plaintiff's suit for recovery of attorneys' fees pursuant to Section 16(b) of

the Securities Exchange Act, 15 U.S.C. § 78p(b) (D.I. 29, 31, 39, 41), hereby orders that

Plaintiff's counsel shall be awarded 8% of the total recovered funds, that is a total payment to

Plaintiff's counsel of $88,529.44

So ORDERED on this 29th day of June, 2009.

Honorable Leonard P. Stark
United States Magistrate Judge